Ellwood M. Rabenold and Elizabeth E. Rabenold v. Commissioner. Ellwood M. Rabenold v. Commissioner.
Rabenold v. Commissioner
Docket Nos. 7873, 7874.
United States Tax Court
1947 Tax Ct. Memo LEXIS 103; 6 T.C.M. (CCH) 1001; T.C.M. (RIA) 47250; August 26, 1947
Ellwood M. Rahbnold, pro se. William F. Evans, Esq., for the respondent. LEMIRE Findings of Fact and Memorandum Opinion LEMIRE, Judge: These proceedings have been consolidated for hearing. Deficiencies in income tax and fraud penalties of 50 per cent were asserted by the Commissioner as follows: Year
Deficiency
Penalty
Docket No. 7873
1933
$ 3,837.90
$3,708.25
1934
827.59
551.45
Docket No. 7874
1935
16,831.30
8,493.59
1936
12,206.90
6,103.45
1937
9,048.45
4,524.23
1938
4,179.28
2,089.64
The issues are (a) whether the Commissioner erred in including the following unreported items as income for one or more of the taxable years - (1) Dividends (1933-1938) (2) Weekly amounts received from *104 Carlos Garcia (1935-1938) (3) Amounts received from Garcia Sugars Corporation accounts (1934-1937) (4) Profit from certain sugar transactions (1933, 1935) (5) Capital gains (1933, 1936-1937) (6) Certain amount received from Carlos Garcia (1938) and (b) whether any part of any deficiency resulting from items (1) through (6) less part of item (5) plus the following items - (7) Unreported partnership income (1933, 1935-1938), and (8) Reported deductions of certain interest and taxes (1935-1936, 1938) is due to fraud with intent to evade tax within section 293 (b) of the Revenue Act of 1938 and the corresponding provisions of prior applicable acts. The petitioners have pleaded in support of their assignment of error as to part of item (5) that the 1933 gain was adjudicated in Ellwood M. Rabenold and Elizabeth E. Rabenold, Docket No. 90921 (memorandum opinion, March 21, 1939, affirmed, 108 Fed. (2d) 639. The sole issue in that case was whether the deficiency should be apportioned between the taxpayers and we held that it should be so apportioned. The deficiency was paid and the payment has been credited in the computation of the deficiency which is now asserted *105 against the same taxpayers for 1933. The Commissioner has no right to determine any additional deficiency in respect of the same taxable year, except in the case of fraud and in other circumstances not herein matcrial. Section 272 (f), Internal Revenue Code; see discussion of section 274 (f), Revenue Bill of 1926, in Senate Report 52, 69th Congress, 1st Session, C.B. 1939-1 (Part 2), pp. 351-353. Therefore, the year 1933 is open only in case of fraud. All other years are open irrespective of fraud. The petitioners have not pleaded the statute of limitations. The petitioners in Docket No. 7873 are husband and wife. They now reside at Breinigsville, Pennsylvania. The husband, alone, is the petitioner in Docket No. 7874. He will be referred to as the petitioner with respect to both proceedings. All of the returns were filed with the collector of internal revenue for the second district of New York. The petitioner is a former member of the New York bar and a former officer of the Clinton Trust Company of New York. He is now engaged in farming. At one time the petitioner represented a Cuban named Carlos Garcia, whose business was dealing in sugar. It appears *106 that Garcia confessed to certain crimes for which he was indicted and convicted in the State of New York. Later, the petitioner was indicted and tried for conspiracy. Garcia testified at that trial. He is now deceased. In the present proceedings the respondent cross-examined the petitioner upon excerpts of the testimony given by him and Garcia at the state trial. The respondent limits the use of such testimony by stating in his brief that the testimony of Garcia was not offered affirmatively in the present proceedings. We have not relied upon Garcia's testimony in finding any of the facts hereinafter set forth. (1) Dividends (1933-1938). The Commissioner included in the petitioner's income certain dividends on stocks of the Borden Company, the Brooklyn Union Gas Company and the Clinton Trust Company. The questions are (a) whether those dividends are taxable to the petitioner, and if so, (b) whether the deficiencies resulting therefrom are due to fraud. Findings of Fact The petitioner's law firm performed legal services during and after 1925 for the Drake Bakeries, Inc. Some of its stock was issued in part payment for those services. Later, the Drake stock was exchanged for *107 stock of the Central Distributors, Inc., which in turn was exchanged for stock of the Borden Company. Prior to 1927 the petitioner's law firm included the petitioner, Mark Hyman, Allen Campell and Charles Scribner. They had previously organized the Adams Securities Corporation to hold securities for the law firm. About 1927 Hyman and Campell ceased being members of the firm. The new partners (and their interests) then consisted of the petitioner (60 per cent), Scribner (30 per cent), and Miller (10 per cent). They in turn organized the Bristow Corporation to hold securities for the new firm. The Bristow stock was issued to the new partners in proportion to their respective partnership interests except that the petitioner's share of that stock was issued in his wife's name. The petitioner was president of the new corporation. The other officers were Scribner, Miller and Kretschmar (a bookkeeper for the firm). The three partners were the directors of the corporation. When the Drake stock was issued to the old law firm it had no book value. It was common stock and in the nature of promotion stock. After the old firm was reorganized the respective partners of the old and new firms *108 (or their representatives) believed that the only chance of developing the value of the Drake stock lay in such continued legal services as might contribute to the success of the Drake business. Therefore they sought to measure the respective interests of the old and new partners in the event of a liquidation of the Drake stock by entering into an agreement for the distribution of the proceeds of that stock between Adams and Bristow, the corporations organized by the old and new firms. The petitioner agreed to hold the Drake stock in his name for that purpose. In 1928 the petitioner, Mark Hyman, Eleanor Campell and Charles Scribner agreed in part as follows: "The Drake common stock amounting to 40,417 shares shall be held by E.M.R. [the petitioner] upon his agreement that in any liquidation of that stock or any suit therefor, he will account to the Adams Securities Corporation for the value of $5.00 a share as of July 1, 1927. "Such value as of July 1, 1927 to be increased at the rate of 6 per cent per annum interest on such $5.00 per share provided such amount is realized in such liquidation and all other further resultant interest shall be in the Bristow Corporation." *109 Subsequently Adams was reorganized under a plan and whereby Hyman and Campell received preferred stock of that corporation in lieu of their interest in the Drake stock. The petitioner was at all times the record holder of the Drake and its derivative stocks, including the Borden stock. He endorsed those stocks in blank and delivered them to Bristow. All of the dividend checks were endorsed either by him or on his authority to the order of that corporation. All of the dividends were entered in an "open account" on the Bristow books at the instance of Scribner. They were not reported in the income tax returns of that corporation until 1938. Scribner and another officer signed the corporate returns for 1933, 1934 and 1935; the petitioner and another officer signed the returns for 1936, 1937 and 1938. All of the returns were prepared by an accountant under the direction of Scribner, who handled the law firm's income tax practice. The respondent determined that the petitioner received annual dividends on the Borden stock of $7,270.40 each during 1933 through 1937, and $6,361.60 in 1938. The petitioner received and paid over those amounts to the Bristow Corporation. He did not own the *110 Borden stock. The repondent also determined that the petitioner received certain dividends on stock of the Brooklyn Union Gas Company in the years 1933 through 1938, as well as certain dividends on stock of the Clinton Trust Company in 1936 and 1937. The Bristow Corporation owned those stocks and the dividends were entered in the "open account" hereinbefore mentioned. The petitioner was not the record holder and he never received the dividends on those stocks. He did not own either the Gas Company or the Trust Company stocks. Opinion The petitioner was the record holder of the Borden stock during all of the taxable years. He contends that he was not the real owner of that stock and we have so found. The agreement of 1928 between the petitioner and his law partners, old and new, shows that the beneficial ownership of the original stock was divided between the Adams Securities Corporation and the Bristow Corporation. Those corporations had been organized to hold securities for the old and new partners, respectively. Two of the old partners gave up their interests in the stock when Adams was reorganized. It is significant that Scribner, who was both an old and new partner, retained *111 his interest in the stock through his ownership of stock in both Adams and Bristow. As to him a special accounting would be necessary under the agreement of 1928. The petitioner apparently considered that Bristow owned all interest in the stock after the reorganization of Adams. He endorsed to it all of the dividends. Scribner apparently insisted upon a segregation of the stock and the dividends on the Bristow books. In either case the petitioner had to account to his law partners under the agreement of 1928 by making a proper distribution between Adams and Bristow in the event of a liquidation of the stock. The petitioner has not explained why the Borden dividends were not reported for income tax purposes on behalf of the real owners of the stock. He testified that his law partner, Scribner, was responsible for the special account on the Bristow books. The dividends were entered in that account but not reported by Bristow until 1938. All of the returns were prepared under the direction of Scribner. He was not called as a witness by either party. The respondent argues that since Scribner was not called by the petitioner we must presume that his testimony would have been unfavorable *112 to the petitioner. We are asked to infer from his silence that the account was used to conceal the petitioner's property, and from that inference to conclude that the petitioner owned the stocks in question. Even if we accepted those inferences, fraud may not thus be presumed. Cf. James Nicholson, 32 B.T.A. 977, affirmed on other issues, 90 Fed. (2d) 978; Henry S. Kerbaugh, 29 B.T.A. 1014, affirmed per curiam, 74 Fed. (2d) 749; T. J. Rogers, 15 B.T.A. 638, dismissed, 41 Fed. (2d) 1012. A copy of the special account was introduced by the respondent. The first page bears the title "Drake Bakeries (Subject to EMR - Adams - Bristow Declaration)". On the next page the title "Adams - Bristow" has been crossed out and the words "Bristow Open Account" have been substituted. The first two titles are consistent with the provisions of the agreement of 1928 between the petitioner and his former law partners for an accounting of securities. The final notation is consistent with the eventual transfer of those securities to the Bristow Corporation after the reorganization of the Adams Securities Corporation. The inferences *113 to be drawn from the face of the special account corroborate rather than refute the petioner's contention that he was not the real owner of the securities in question. The respondent also relies upon another unexplained transaction whereby the Drake stock was at one time pledged by Bristow to secure a loan, the proceeds of which were turned over to Rabenold & Co., Ltd. The petitioner's wife became Rabenold's sole stockholder at an undisclosed time. The respondent argues that we should look through the corporate entities, treat the petitioner's wife as his nominee, and find that he owned the Drake stock. That argument is contradicted by the agreement of 1928 between the law partners which shows that the petitioner was not the real owner of the Drake stock. Further, that argument ignores the plain fact that not only the petitioner (or his wife) but also his law partners had an interest in Bristow. On all the evidence we have found that the petitioner was not the owner of either the Borden Company, the Gas Company or the Trust Company stocks. It follows that the dividends on those stocks were not his income. We hold that the Commissioner erred in adding those dividends to the petitioner's *114 income. There is, therefore, no question of fraud to be considered in connection with the dividends. (2) Weekly amounts received from Carlos Garcia (1935-1938). The Commissioner determined that certain amounts received weekly from Carlos Garcia and aggregating $4,375 in 1935, $6,625 in 1936, $5,733.02 in 1937, and $11,000 in 1938, are taxable to the petitioner. The questions are (a) whether those determinations are correct, and if so, (b) whether the deficiencies resulting therefrom are due to fraud. Findings of Fact Garcia was president of the Insular Terminal Corporation which was engaged in the business of warehousing commodities such as sugar, cocoa beans, etc. Its stock was held in equal shares by Garcia and Rabenold & Co., Ltd. The latter corporation was originally organized to hold a seat on the New York Coffee and Sugar Exchange. The seat was actually listed in the name of the petitioner's brother, Paul, who was president of the corporation. The petitioner was chairman of its board of directors. At various undisclosed times the petitioner, his brother, and the petitioner's wife were stockholders. She was the sole stockholder during the taxable years. Garcia drew a *115 weekly salary of $125 from Insular. When the net earnings of that corporation reached a level of $250 a week Garcia told the petitioner that he would increase his salary to that amount and distribute half of it to Rabenold & Co., Ltd., so that each half owner of the Insular stock would receive a like amount of the Insular earnings. Pursuant to that plan Garcia drew and cashed checks on Insular in the aggregate amounts of $8,500 in 1935, $13,250 in 1936, and $7,000 in 1937. Half of the amounts so withdrawn were paid in cash by Garcia to the petitioner. He turned those amounts over to his wife. She used some of the money for household expenses. Neither Rabenold & Co., Ltd., nor the petitioner, nor his wife reported the amounts received from Garcia. Opinion The petitioner contends that Garcia received the amounts in question as salary and therefore that they represent gifts to his wife. The respondent contends that the petitioner is taxable upon those amounts because they were not salary but were in fact a distribution of the Insular earnings. We agree with the respondent that on the evidence in these proceedings the amounts in question were a distribution of the Insular earnings. *116 Further, we think that they were in substance a distribution of the Rabenold earnings. Rabenold was entitled to the Insular earnings. The ultimate question is whether the earnings thus distributed were the petitioner's income. That question turns upon the ownership of the Rabenold stock. The facts show that the petitioner's wife held all of the Rabenold stock during the taxable years. The facts do not show how or when she acquired that stock. There is evidence that she put in "the initial money"aand got all of the stock. We do not know whether she was originally an investor or a creditor. We do not know when she got the stock. There is evidence that the petitioner and his brother were at one time stockholders. We do not know whether the petitioner's wife succeeded them as the real owner or whether she became merely the record holder for the petitioner in whole or part. It is impossible for us to determine from the present record who was the real owner of the Rabenold stock. We think that both parties have failed to carry their respective burdens of proof. The petitioner had the burden of showing that he was not the real owner of the Rabenold stock in order to overcome the presumption *117 that the Commissioner had correctly taxed him upon the Insular-Rabenold earnings. The presumption that he owned the Rabenold stock is inherent in the Commissioner's determination. We hold that the petitioner has failed to overcome that presumption. On the other hand, the respondent can not rely upon such a presumption to carry his burden of proof. James Nicholson, supra.The respondent had to show that the petitioner was the real owner of the stock in order to sustain the fraud penalties. We hold that the respondent has failed to establish that any part of the deficencies resulting from these transactions is due to fraud. (3) Amounts received from Garcia Sugars Corporation accounts (1934-1937). The Commissioner included in the petitioner's income certain funds withdrawn from an account in the name of the Garcia Sugars Corporation as follows: $1,000 in 1934, $5,500 in 1935, $30,433.75 in 1936, and $16,655 in 1937. The questions are (a) whether those determinations are correct, and if so, (b) whether the deficiencies resulting therefrom are due to fraud. Findings of Fact Garcia was president of the Garcia Sugars Corporation which was a selling agent in New York *118 for Garcia-Beltran Company of Havana, Cuba. The latter corporation was a distributor for several refineries, including one which was operated by the Mabay Sugar Corporation. The Garcia brothers owned Mabay stock. The petitioner's original law firm had received bonds issued by Mabay as part payment of a fee for services. The bonds had been turned over to the Adams Securities Corporation, hereinbefore mentioned, in which the petitioner's former law partners had an interest. The petitioner had guaranteed that these partners would receive $100,000 upon the sale of the Mabay bonds and other securities held by Adams. Garcia agreed to purchase the Mabay bonds from Adams. To that end he authorized the withdrawal of funds by the petitioner from an account of Garcia Sugars Corporation which was maintained in the trust department of the Clinton Trust Company. The petitioner accounted to his partners for the amounts so withdrawn. The petitioner did not own the Mabay bonds and did not retain the proceeds thereof. Opinion The respondent has not requested us to find any specific facts, and advances no argument, with respect to the proceeds of the Mabay bonds. The evidence clearly supports *119 the petitioner and we have so found. We hold that the respondent erred in taxing the amounts in question to the petitioner. It is therefore unnecessary to consider the question of fraud. (4) Profit from certain sugar transactions (1933, 1935). We consider here four separate transactions. The first transaction involves a profit of $3,727.70 from sugar futures which the Commissioner included in the petitioner's income for 1933. The three remaining transactions are involved in the 1935 deficiency and were explained by the Commissioner as follows: "Profit of $24,527.38 realized by you in 1935 as a result of certain dealings in sugar [futures], not reported on your return, has been included in taxable income. "Amount of $13,000.00 received in 1935 from Garcia Sugar Corporation in connection with the sale of [raw] sugar for export, not reported on your return, is held to constitute income taxable to you. "Legal fee of $1,000.00 received from Garcia Sugar Corporation in connection with certain sugar transactions, not reported, has been taken into account for tax." The petitioner has assigned as error the action of the Commissioner in including all of the amounts in his income. *120 The respondent has alleged that the petitioner fraudulently failed to report the profit of $3,727.70 in 1933 and the profit of $13,000 in 1935. He has made no allegation of fraud concerning the other amounts. Thus, the questions are (a) whether the Commissioner was correct in including all of the amounts in the petitioner's income and, if so, (b) whether the portions of the deficiencies resulting from the inclusion of the $3,727.70 and the $13,000 are due to fraud. Findings of Fact 1933. The petitioner dealt in sugar futures for the account of his law partnership, Rabenold & Scribner, in 1933. A profit of $3,727.70 from that transaction was deposited in the firm bank account. The profit was not withdrawn by the petitioner. However, it was partially distributable to him because he was entitled to a 60 per cent share of the partnership profits. The petitioner reported in his return a net loss which was shown as his share of the partnership's net loss for 1933 in its information return. 1935. In the latter part of December, 1934, Carlos Garcia told the petitioner that it would be a fortunate thing for anybody to own sugar and asked him if he cared to participate in the purchase *121 of sugar futures. The petitioner told Garcia that he did not want to participate for his own account because he did not want to pay income taxes on profits which he knew he would put into the Rockland Lake Corporation for mortgage interest and taxes. Garcia then suggested that Rockland be put into the participation and the petitioner agreed. Rockland was engaged in the real estate and amusement business. Over a period of years it owned, managed and developed certain lakefront property which was subject to a purchase money mortgage. The balance of the purchase price had been financed by the petitioner's wife out of her own funds and she received all of Rockland's stock. She was the real owner of that stock. The petitioner was Rockland's treasurer and one of its directors. The corporation had gross receipts from rents of about $6,000 annually which was insufficient to meet the taxes due on its property and the interest due on its mortgage. The petitioner advanced money to meet taxes and interest. Eventually the mortgage was foreclosed. Neither the petitioner nor his wife was personally liable on the mortgage. Rockland's 1935 return shows gross receipts of $35,031.06, a net loss, and *122 "no tax" due. The petitioner signed the return as treasurer. On January 4, 1935, the Garcia Sugars Corporation paid half of the profits from that transaction by delivering its check in the sum of $24,527.38, drawn to the order of Rockland. The check was endorsed by the petitioner as treasurer and deposited to Rockland's account. Later in 1935, Garcia had a discussion with the petitioner about Rockland being a participant in the purchase of certain raw sugar. Rockland participated in that transaction with Garcia Sugars Corporation. The raw sugar was purchased with the proceeds of a loan made by the Clinton Trust Company to Garcia. The sale of the sugar resulted in a profit, half of which was paid by checks aggregating $21,900, drawn to the order of Rockland, endorsed by the petitioner as treasurer and deposited to the account of that corporation. Only $13,000 of the total profit was paid during 1935. The balance was paid during 1936. The petitioner did not participate for his own account in the raw sugar transaction. Opinion 1933. There is no evidence to show whether the profit of $3,727.70, which was realized by the petitioner's law partnership, was reported in the partnership's *123 information return. The petitioner may or may not have reported his share of the profit, depending upon whether it was included in the computation of the partnership's net loss. However, since the year 1933 is open only in case of fraud, we are concerned here primarily with the respondent's burden of proof. The respondent's brief is silent with respect to this transaction. It was his burden to show that the petitioner had failed to report his share of the profit in order to sustain the fraud penalty. He offered no evidence to show that fact. It can not be presumed. Cf. James Nicholson, supra.We hold that the respondent has failed to establish any fraud in connection with the 1933 profit. In the absence of fraud the year 1933 is closed to any additional deficiency. 1935. The basic question, common to both of the sugar transactions from which Rockland Lake Corporation received half of the profits, is whether the petitioner really acted for himself or for Rockland. We have been impressed by the fact that the petitioner's testimony in these proceedings and his testimony at the state court trial are not contradictory. He was confronted with excerpts from the latter testimony *124 approximately eight years after it had been given in the state court. His story then, and his story now, is the same. While some of the details are wanting in both stories the respondent did not succeed in his efforts to discredit the petitioner's contention that Rockland was the participant in the sugar transactions. Indeed, the respondent was responsible for the introduction of the following testimony given by the petitioner in the state court concerning the dealings in sugar futures: "There was participation in the latter part of December, 1934 carried into the beginning of 1935. The occasion for the participation arose from the facts as discussed with Mr. Garcia as he stated to me that the technical position of the sugar market in 1934 was such that it would be a fortunate thing for anybody to own sugar and he told me that he was going to buy sugar futures and asked me if I cared to participate with him in the purchase. * * *
"I told him I agreed with him that it might be a profitable situation but I said I cannot take any personal participation because if there should be a profit, I cannot take the profit. It would simply mean I would be paying income taxes on it, and *125 yet the money itself I know I would simply put into the Rockland Lake Corporation for the mortgage interests and for the taxes on the Rockland Lake Corporation properties. * * *
"He said * * * 'then put the Rockland Lake Corporation into the participation.' And I said, 'If you want to do that, that is agreeable with me.' The Rockland Lake Corporation was the participant with Mr. Gardia [Garcia]. The account was rendered to the Rockland Lake Corporation and the check representing the participation in the profits was made payable to the Rockland Lake Corporation and went into the Rockland Lake Corporation account with the Chase National Bank." The transaction relating to the purchase of raw sugar occurred during 1935 and 1936. The petitioner testified in the present proceeding concerning this transaction as follows: "Q. I will ask you if it isn't true that at the time that Garcia was discussing the question of speculation or investment in that raw sugar, if he didn't approach you with the idea of your being a partner in the transaction? "A. Well, it didn't come about in that way. The corporation had been a participant in other transactions before that. "Q. I am talking *126 about this particular transaction. "A. This discussion here was with a view of the Rockland Lake Corporation being a participant in this transaction. I am sure there was no discussion about my personally being a participant in it." We think the petitioner testified truthfully. On the other hand, the petitioner's testimony does not preclude the possibility that he might have furnished either money or credit to finance the transactions in question. We do not know from the present record just who financed the purchase of sugar futures. We do know from other testimony given by the petitioner at the state trial that the purchase of the raw sugar was financed by Garcia with the proceeds of a loan which he obtained from theclinton Trust Company. In the absence of evidence showing clearly that the petitioner furnished neither money nor credit for the purchase of the sugar futures we sustain the Commissioner's determination that one-half of the profit realized from the sale thereof in 1935 is taxable to the petitioner. There is no allegation of fraud in connection with this transaction and hence no fraud issue before us. We are satisfied from a consideration of all the evidence that *127 the petitioner did not participate for his own account in the raw sugar transaction. He has shown that he did not finance that transaction. It is clear that he did not enjoy any taxable benefit from the realization of the profit. The respondent has requested an ultimate finding that the profit in question was the petitioner's property and that "his voluntary and oral assignment of same to Rockland Lake Corporation was done with fraudulent intent to evade the payment of taxes thereon." In our opinion the petitioner did not earn the profit in question and therefore had no property to assign. We hold that the Commissioner erred in taxing the petitioner on one-half of the profit realized from the sale of the raw sugar in 1935. It is therefore unnecessary to consider the fraud issue raised by the respondent. It should be noted that the amount of the profit realized in 1936 is not before us since the Commissioner did not include that amount in the petitioner's income for that year. We have not found any facts concerning the final transaction which has been designated by the respondent as a legal fee. The petitioner testified as follows: "The next item is legal fee. It wasn't a legal *128 fee at all. When it came to figuring out the participation of Rockland Lake Corporation, in which Rockland Lake Corporation was to have a given percentage interest as its interest in the joint venture, it appeared that another coadventurer, that is, another member of the joint venture, had had expenses of $1,000 which threw the percentage out and this $1,000 was to even up that distribution. The $1,000 did not come to me. It went to Rockland Lake Corporation as part of its share in the joint venture." We do not understand that testimony. If Rockland had incurred expenses of $1,000 we could then understand that it should be reimbursed for the amount in question. In our opinion, the petitioner has failed to explain this transaction and his testimony amounts to no more than a general denial. We hold that he has failed to overcome the presumption of correctness attaching to the Commissioner's determination. The respondent has not alleged fraud in connection with this item. (5) Capital gains (1933, 1936-1937). The Commissioner determined that the petitioner had a net capital gain of $19,816.87 in 1933, and capital gains of $2,016.39 in 1936, and $10,747.20 in 1937. The questions are *129 (a) whether those gains are taxable to the petitioner and, if so, (b) whether the portion of the deficiency resulting from the 1933 gain is due to fraud. The respondent has not alleged fraud in connection with the gains for 1936 and 1937. Findings of Fact 1933. The petitioner's wife, who is also a petitioner in Docket No. 7873, realized a capital gain of $19,816.87 in 1933. A deficiency resulting from that gain was adjudicated by us in an earlier proceeding. See Ellwood M. Rabenold and Elizabeth E. Rabenold, Docket No. 90921 (memorandum opinion, March 21, 1939), affirmed, 108 Fed. (2d) 639. 1936. The Bristow Corporation, hereinbefore mentioned, realized a gain in 1936 upon the sale of 30 shares of Clinton Trust Company stock and certain bonds of the 61 Broadway Corporation. These securities were held in the Bristow "open account", hereinbefore mentioned. They were not owned by the petitioner. 1937. A stockholder of the Clinton Trust Company offered 300 shares of its stock for sale in 1936. The market was then narrow and Clinton was then planning to increase its capital by offering new stock to its stockholders at a fixed price. The petitioner, who was an officer *130 of Clinton, thought that the market would be depressed by such a sale and he turned to Garcia for help. Garcia purchased the 300 shares of the Clinton stock through a brokerage firm which advanced a loan against the stock as collateral. The petitioner and Garcia executed the following agreement dated January 21, 1936: "It is understood and agreed that the three hundred shares of Clinton Trust Company stock referred to * * * are held via a joint account with the right in Ellwood M. Rabenold to take up all or any part of such stock at any time at cost." Later, the pledgee of the stock received a dividend which was used to purchase an additional 60 shares of Clinton stock. The petitioner did not exercise his right to take up the stock but transferred that right to Rockland Lake Corporation and Camp Knickerbocker, Inc. The latter operated a fresh air camp for children. After the transfer the Clinton stock was sold at a profit which was paid in 1937 to Rockland and Camp Knickerbocker. Rockland's 1937 return shows a gain of $13,427.45 from the sale of 250 shares of Clinton stock. Presumably, the balance was paid to Camp Knickerbocker. Opinion 1933. With respect to the gain realized *131 by the petitioner's wife, the respondent is seeking to impose a fraud penalty on a deficiency determined in an earlier proceeding. The petitioner relies upon the adjudication in that proceeding but has not offered the record of that proceeding in these proceedings. Nevertheless, it is unnecessary to consider the facts on the merits because the respondent, who had the burden to do so, has not offered any evidence in support of his allegation that the original deficiency was due to fraud. The original deficiency has been paid. Without deciding whether a fraud penalty may be imposed under these circumstances we hold that the respondent has failed to establish that the portion of the deficiency resulting from the 1933 gain was due to fraud. 1936. The Commissioner determined that the 1936 gain resulted from the sale of 30 shares of Clinton Trust Company stock and certain bonds of the 61 Broadway Corporation. There is no fraud issue. The petitioner testified that he had neither bought nor sold either the stock or the bonds and knew nothing about those transactions. The respondent's witness traced the transactions to the "open account" of the Bristow Corporation. The respondent does not *132 mention the transactions in his brief. On all the evidence, including that already considered in connection with dividend income from the Clinton and other stocks, we have found that the petitioner did not own the securities now in question. We hold that the petitioner is not taxable on the 1936 gain. 1937. The Commissioner determined that the 1937 gain resulted from the sale of 360 shares of Clinton Trust Company stock. Fraud is not an issue. The respondent contends that the gain from that sale was realized by the petitioner whereas the petitioner contends that the gain was realized by the Rockland Lake Corporation and Camp Knickerbocker. We have found that the petitioner did not exercise his right to take up the Clinton stock under his agreement with Garcia but that he gave such right to Rockland and Camp Knickerbocker. On all of the evidence we have found that the gift was made in advance of the sale. The petitioner testified that it was "at the beginning before any results were known". We think he testified truthfully. The petitioner parted with a property right and not with the income from property. We hold that the respondent erred in taxing the 1937 gain as the petitioner's *133 income. (6) Certain amount received from Carlos Garcia (1938). The Commissioner included $1,000 in the petitioner's income for 1938 with the following explanations: "In the absence of evidence to the contrary, an amount of $1,000.00 received by you in 1938 from Carlos Garcia is held to constitute income taxable to you in such year." Findings of Fact Carlos Garcia loaned Rockland Lake Corporation $1,000 during 1938. He did not pay that amount to the petitioner. Opinion The petitioner explained this transaction as being "* * * an outright loan to Rockland Lake Corporation represented by a check to Rockland Lake Corporation, deposited by Rockland Lake Corporation in its own bank account and used by Rockland Lake Corporation for its own corporate purposes as to which no part was received by me and no part directly or indirectly was used by me or for my benefit." Elsewhere in the record there is evidence that Rockland Lake Corporation had difficulty in meeting its obligations for mortgage interest and taxes. We think that the petitioner testified truthfully and that he has overcome the presumption of correctness attaching to the Commissioner's determination. The respondent *134 did not go forward with any evidence and has not argued the point. We have found that the amount involved was a loan. We hold, therefore, that it was not taxable income to the petitioner. Consequently, it is unnecessary to consider the fraud issue. (7) Unreported partnership income (1933, 1935-1938). The petitioner has not assigned any error with respect to the inclusion of additional income which the Commissioner determined that he had received from the partnership of Rabenold & Scribner, attorneys at law. The amounts involved are as follows: Year
Reported
Unreported
1933
($12,338.28)
$39,436.06
1934
7,669.81
3,194.43
1935
13,339.25
5,078.41
1936
6,041.10
707.82
1937
7,852.02
272.41
1938
9,811.49
618.63
The respondent has alleged that the petitioner wilfully and fraudulently failed to report the true amounts received in each year except 1934 with intent to evade lawful tax due the United States. That issue presents the sole question to be decided since the unreported amounts are not challenged and therefore stand without action on our part. Opinion We find no facts concerning the partnership income because there is no evidence from *135 which any material facts could be found. The respondent can not rely upon the correctness of his determinations with respect to the unreported amounts to carry his burden of proving fraud. To hold otherwise would be equivalent to holding that fraud may be presumed. Cf. James Nicholson, supra. With respect to partnership income the petitioner testified as follows: "* * * here again I have no records upon which either to affirm the correctness of the amount or to dispute it, and no question is raised here with respect to the amount of this alleged deficiency. I am no longer a member of the law firm, haven't been since May 23, 1939. I have no books or records of the law firm and was, of course, not present during any reaudit and my testimony here is designed merely to bear upon the question of willful evasion, and my testimony is that every year here involved, and in fact every year during my entire membership in the law firm, I did not make up any partnership income tax return and I did not sign or make up any partnership income tax return. "Such partnership income tax returns were uniformly made out by the bookkeeper and the accountant under the supervision of a *136 member of my law firm, Mr. Scribner, who was more alert in income tax matters and had income tax matters generally under his supervision for clients, as well as our own. "I might or might not see the income tax return at all when it was signed or ready to be filed. I knew simply that when my own personal income tax return was made up, the figure representing my interest in the law firm was taken from such partnership income tax return." The respondent has not offered any evidence. He admits on brief that he has "very little direct evidence indicating the fraudulent intent in respect of the partnership income, except the general situation that in each of the years involved there is evidence of fraud in respect of other income received and petitioner's general tendency to evade taxes." He argues that the gross understatement of net taxable income in 1933 is of such magnitude as to compel the conclusion that falsity was known and deliberate. It is inconceivable, he says, that a lawyer should be so negligent. The same 1933 partnership income was the basis for part of the original deficiency which was asserted in the earlier case of Ellwood M. Rabenold and Elizabeth E. Rabenold, supra. *137 In that case all issues were settled by stipulation except the question whether the deficiency should be apportioned between the taxpayers and found against each of them in the amount so apportioned. The amount held to be due by the petitioner was paid and has been credited in the computation of the present deficiency for 1933. Without deciding whether a fraud penalty may be imposed under these circumstances for 1933 we hold that the respondent has failed to establish that the portions of the deficiencies resulting from the inclusion of unreported partnership income for all years involved are due to fraud. (8) Reported deductions of certain interest and taxes (1935-1936, 1938). The petitioner has not assigned any error with respect to the disallowance of deductions which he took for taxes in 1933, 1935, 1936 and 1938, and for interest in 1935, 1936 and 1938. The Commissioner's adjustments therefore are not in issue. However, the respondent has alleged that the deductions were fraudulent for the years 1935, 1936 and 1938. Opinion The respondent has not offered any evidence, he has not requested any findings of fact, and he has not made any argument concerning the deductions *138 in question. We can not presume that the deductions were fraudulent. We hold that the respondent has failed to establish that the portions of the deficiencies resulting from the disallowance of the deductions for taxes and interest are due to fraud. Fraud in general. The respondent contends that the present proceedings are "not unlike a jigsaw puzzle until the component parts are fitted together, then the composite picture * * * appears as a complete scheme in tax evasion." Primarily, he argues that the corporations in which the petitioner's wife was a stockholder were instrumentalities of the petitioner. We have already considered that argument in connection with each of the issues to which it might be applicable. Finally, the respondent points to the amounts of the petitioner's tax payments. The returns for six years show total taxes of $1,714.14. Taxes depend upon many factors. One of those factors is the prevailing rate of tax. Other factors such as items of income and deduction have been challenged in part in these proceedings. Other factors such as exemptions and credits have never been challenged by the respondent. We have concluded that the evidence as a whole fails *139 to show that any part of any deficiency is due to fraud with intent to evade tax. Decisions will be entered under Rule 50.